## TEIS v. SMUGGLER MINING CO.

(Circuit Court of Appeals, Eighth Circuit. December 9, 1907.)

No. 2,593.

1. NEGLIGENCE—PROXIMATE AND REMOTE CAUSES.

The philosophy of the responsibility for a negligent act is that the wrongdoer is answerable only for such consequences as flow directly from the act and are such as a reasonable man should anticipate would probably result from the act first committed. Where a negligent act of the defendant is not wanton, the law attaches responsibility to it for all the consequences which ensue directly therefrom and for such effect as in the natural order of sequence follows therefrom, no matter how remote in point of time or distance, limited by the requirement that the ultimate result must be such as that a reasonable person should anticipate that in the natural order of things would probably ensue. Whenever this causal connection between the negligent act and the ultimate injury is interrupted by reason of the interposition of some independent force or human agency acting independently of the first negligent act, but for which the ultimate injury would not have come, the former is the remote and the latter is the proximate cause.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Negligence, §§ 69–82.]

2. MASTER AND SERVANT—INJURY TO SERVANT—PROXIMATE CAUSE OF INJURY.

Plaintiff while employed in defendant's mine was overcome by gas, and was afterward found by a searching party lying on the ground unconscious. He was taken to the surface by such party on the elevator cage which was 5½ feet square, two sides being inclosed and two open, and by reason of the projection of one of his feet beyond an open side of the cage it was caught by the timbers of the shaft and his leg broken. Held, that the negligence of defendant in permitting a dangerous quantity of gas in the mine, if conceded, while a remote, was not the proximate, cause of the injury to plaintiff's leg, which was the negligence of those who placed him on the cage, and that, under the rule that one committing an act of negligence is responsible only for such consequences as would naturally and probably result and as should reasonably have been foreseen, defendant was not liable for such injury.

**3. TRIAL—DIRECTION OF VERDICT—UNDISPUTED FACTS.**
    Where the facts of the particular case are disputable and are of such character that different minds might reasonably draw different conclusions therefrom, it presents a question of fact properly determinable by the jury; but, where there is no dispute about the facts and the law pronounces the judgment on the facts established, it is the province and duty of the court to direct the verdict.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, §§ 376–380.]

In Error to the Circuit Court of the United States for the District of Colorado.

M. J. Galligan, for plaintiff in error.

William E. Hutton (Bruce B. McCay, on the brief), for defendant in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. This is an action for personal injury. At the conclusion of the plaintiff's evidence, the court directed a verdict for the defendant in error. To reverse this action the plaintiff has brought the case here on writ of error.

The plaintiff was an employé of the defendant, working in its mine, in which there was more or less gas escaping. He had worked in this mine for 12 or 14 months prior to the accident. In the month of August, 1903, some of the timbers employed in the mine took fire, when the work therein was suspended until the first part of September. The plaintiff returned to work about three days prior to the injury in question. He was engaged, in connection with one Crozier, a fellow servant, in hauling ore out of the mine with a tramway car drawn by a horse. On the afternoon of September 8, 1903, the gas in the level where the plaintiff was at work manifested itself in sufficient quantity to make it uncomfortable to the plaintiff and his fellow workman. They came out of the mine two or three times, and remained in the fresh air for half an hour or more at a time to get rid of the effects of the gas. The last time was just before supper, when the plaintiff complained of a headache produced by the gas. His testimony is that:

    "We did pretty well before supper, and did not feel the gas very much. Of course, we felt it a little bit, and Crozier asked me how I felt about supper time. I told him I was not feeling very good—and said I would not like to go in there again right away. He said: 'Wait a little while, and you'll feel all right.' Pretty soon he came along with the horse and train, so I thought I would not let him go in alone, and I jumped on too, of course. When we got in, we found that the chutes were tied up, and Crozier told me to go up to the 40 foot, the gas was not so bad, and he said he would load the car, and I said 'All right,' and started out, and that is all I know about it. I must have dropped right there."

He further testified that just after supper, when they started into the mine, Crozier took a piece of waste and tied it around his nose. He further testified to having had a conversation with Mr. Carey, the mine superintendent, before he went into the mine the last time; that Mr. Carey asked him how he felt and he told him he had a headache, and Carey told him he would get over that, that it would not hurt him; that he need not be afraid, there was no danger about the gas. As

the plaintiff and Crozier did not return to the surface as soon as expected by the men at the top, which was an hour or more after they had returned to work, a searching party went after them. The plaintiff was found about a hundred or more feet from the elevator shaft, to one side of the tramway track, prostrate on the ground, with his face downward, and in a comparatively unconscious condition. Crozier was found lying on top of him dead. There were two methods of egress from where they were found: One was out by the tunnel through which the tramway ran, some 500 or 600 feet. The other was by the elevator cage. The rescuers carried the plaintiff to the latter, which was a square cage about 5½ feet wide between the sides, two of which were closed and the other two were open. The shaft, of course, was larger, with timbers eight feet by eight inches. There was no light in the elevator, except, perhaps, the customary lamps on the men's hats or caps. The rescuers laid the plaintiff on the floor of the elevator; and their testimony is that in their ascent the plaintiff did not move. When they reached the surface, upon examination, it was discovered that one of the plaintiff's legs at the ankle was broken, and the injury was more or less serious. His testimony was that in going up the elevator, in a dazed kind of way, his eyes opened, when he felt the shock, and he seemed to fall asleep again, that he recollected that much of it, and it was all he knew about it.

The petition counts alone upon this injury to the leg as the basis of damages. The allegation in this respect is that:

"While being taken from said level in a cage in a shaft in said mine to the surface thereof, as the result of being so overcome by gas, and while so unconscious by reason thereof, his leg became caught in said cage and timbers while he was being so taken to the surface, and his leg was broken, and he thereby became seriously and permanently injured, and suffered great pain," etc.

The petition further alleges that the plaintiff resumed work in the mine shortly before the accident, as the defendant assured him there was no danger from the gas, and that he relied upon said assurance; and charges negligence on the part of the defendant in failing to inspect said tunnel level in a proper manner, in failing to discover gas in dangerous quantities at the place where the plaintiff was at work, and failed to provide reasonable, suitable, and sufficient ventilation in said mine. The answer pleaded the general issue and assumption of risk by the plaintiff.

Three questions are presented by this record: (1) Was the defendant company guilty of actionable negligence in permitting gas in the mine in sufficient quantity to affect the plaintiff? (2) Did the plaintiff, with knowledge of the presence of the gas in the mine, continue to work therein under circumstances which would charge him with assumption of the risk? (3) Was the defendant's alleged negligence the proximate cause of the injury to the plaintiff's leg?

When the work in the mine ceased in August, by reason of the timbers therein taking fire, most certainly there was not present in the mine, during the existence of the fire, any dangerous quantity of gas, as there was no explosion therefrom. If there was gas in the mine in such quantity as to attract attention so as to impose upon the super-

intendent the duty of giving warning thereof to the employés and taking energetic steps to remove the danger, knowledge of that fact was as obvious to the plaintiff as to the inspector.  As persuative proof that up to the time the plaintiff was overcome there was no apparently dangerous quantity of gas in the mine, there were about 100 men at work therein, and there is no evidence of any deleterious effect upon or complaint made by them.   The evidence is that the mine was equipped with the usual machinery for pumping fresh air into it through a six-inch pipe, and with a corresponding pipe for drawing therefrom foul air and gases.  There was no evidence that the equipment for such purpose was not the usual, ordinary provision suitable therefor. Neither was there any tangible evidence of any lack of due care on the part of the superintendent in making reasonable inspection of the mine.  On the contrary, the evidence is that the foreman had been in the mine twice that afternoon; his last observation being taken about three hours before the accident, without discovering the presence of any dangerous quantity of gas.  Under such state of the proofs, the statement made by Carey, the superintendent, to the plaintiff, was little more than an expression of opinion on his part that, with the facts in his possession, in his judgment it was not dangerous for the plaintiff to return to work, remaining for short periods in the mine.  Plaintiff's testimony further is that, when he saw Crozier coming along with the horse and train, he thought he would not let him go in alone, and he jumped onto the train and went with him, indicating that he acted upon the impulse of fellowship rather than reliance upon the statement made to him by the superintendent.  If it be conceded that these were questions for the determination of the jury, the foregoing statement of the essential facts makes it quite indisputable that the appearance of sufficient gas at the time of the injury to asphyxiate the plaintiff and Crozier was sudden and abnormal.  The important question therefore is:   Was the injury to the plaintiff's leg the proximate cause of the imputed negligence of the defendant company in exposing the plaintiff, according to his contention, to the gas in the mine?

Without undertaking to review the mass of authorities bearing on this vexed question, it is sufficient to say that they range themselves along two lines, closely allied, but more or less divergent.  The one asserts that, when several concurring acts or conditions of things— one of them the wrongful act of the defendant—produce the injury, and it would not have been produced but for such wrongful act or omission, it is the proximate cause of the injury.  From this postulate the plaintiff's counsel argues that but for the gas in the mine the plaintiff would not have been rendered helpless, so as to have been exposed to the supervening negligent act of the men in so placing him in the elevator cage as to leave his leg extending beyond the outside thereof, whereby it came in contact with the timbers; and therefore the negligent act of exposing him to the gas was a continuing, unbroken cause.  This, it seems to us, is the argument post hoc proctor hoc.  It runs back to the first wrongdoer, no matter how many supervening or intervening causes.  It admits of no break in the chain of causation,

because it is builded on the presumption that but for the first negligent act the person injured might not have come into the position where the supervenient cause, although put in motion by a force entirely independent of the first, smote the party to his injury. Carried to its logical sequence, where A. should wrongfully eject B. from his house at a time when the sky was clear, if a storm should suddenly arise and a flash of lightning should kill B., his death would be the proximate cause of the act of ejection. Opposed to this doctrine is the line of authorities asserting the rule to be that, where the negligent act of the defendant is not wanton, the law attaches responsibility to it for all the consequences which ensue directly therefrom, and for such effect as, in the natural order of sequence, follows therefrom, no matter how remote in point of time or distance, limited by the requirement that the ultimate result must be such as that a reasonable person should anticipate that in the natural order of things would probably ensue. Whenever this causal connection between the negligent act and the ultimate injury is interrupted by reason of the interposition of some independent force or human agency, acting independently of the first negligent act, but for which the ultimate injury would not have come, the former is the remote and the latter is the proximate cause. This is very aptly expressed by Wharton thus:

"The intervener acts as a nonconductor and insulates the negligence."

The philosophy of the responsibility for a negligent act is that the wrongdoer is answerable for such consequences as flow directly from the act, and are such as a reasonable man should anticipate would probably result from the act first committed. Judge Cooley, in his work on Torts (volume 1 [3d Ed.] p. 99), with characteristic exactness, has summarized the rule as follows:

"It is not only requisite that damage, actual or inferential, should be suffered, but this damage must be the legitimate sequence of the thing amiss. The maxim of the law here applicable is that in law the immediate, and not the remote, cause of any event is regarded; and in the application of it the law rejects, as not constituting the foundation for an action, that damage which does not flow proximately from the act complained of. In other words, the law always refers the injury to the proximate, not to the remote, cause. The explanation of this maxim may be given thus: If an injury has resulted in consequence of a certain wrongful act or omission, but only through or by means of some intervening cause, from which last cause the injury followed as a direct and immediate consequence, the law will refer the damage to the last or proximate cause, and refuse to trace it to that which was more remote. The chief and sufficient reason for this rule is to be found in the impossibility of tracing consequences through successive steps to the remote cause, and the necessity of pausing in the investigation of the chain of events at the point beyond which experience and observation convince us we cannot press our inquiries with safety. To the proximate cause we may usually trace consequences with some degree of assurance; but beyond that we enter a field of conjecture, where the uncertainty renders the attempt at exact conclusions futile. A writer on this subject has stated the rule in the following language: If the wrong and the resulting damage are not known by common experience to be naturally and usually in sequence, and the damage does not, according to the ordinary course of events, follow from the wrong, then the wrong and the damage are not sufficiently conjoined or concatenated as cause and effect to support an action."

As a corollary to this postulate he says (page 101):

"When the act or omission complained of is not in itself a distinct wrong, and can only become a wrong to any particular individual through injurious consequences resulting therefrom, this consequence must not only be shown, but it must be so connected by averment and evidence with the act or omission as to appear to have resulted therefrom according to the ordinary course of events, and as a proximate result of a sufficient cause."

The Court of Appeals of Pennsylvania in Hoag et al. v. Lake Shore & Michigan Southern Railroad Company, 85 Pa. 293, 27 Am. Rep. 653, has applied this better rule. In that case the plaintiff owned an oil lease near the defendant's railroad track, where it ran along the bank of Oil creek at the base of a high hill. A slide of earth and rocks, during a rainstorm, came down the hillside, lodging on defendant's track. A train of cars of the defendant, loaded with crude petroleum, ran into this slide, whereby the train was derailed and the petroleum ignited by fire from the engine. The ignited oil ran into the creek and was carried down stream some 300 or 400 feet, setting fire to the plaintiff's building, destroying it. It was held that the plaintiff could not recover because the destruction of the building was not the proximate cause of the defendant's imputed negligence. The court said:

"A man's responsibility for his negligence and that of his servants must end somewhere. There is a possibility of carrying an admittedly correct principle too far. It may be extended so as to reach the reductio ad absurdum, so far as it applies to the practical business of life. * * * The true rule is that the injury must be the natural and probable consequence of the negligence—such a consequence as, under the surrounding circumstances of the case, might and ought to have been foreseen by the wrongdoer as likely to flow from his act. This is not a limitation of the maxim, 'Causa proxima non remota spectatur.' It only affects its application. * * * It would be unreasonable to hold that the engineer of the train could have anticipated the burning of the plaintiff's property as a consequence likely to flow from his negligence in not looking out and seeing the landslide. The obstruction itself was unexpected. * * * The probable consequences of the collision, such as the engineer would have a right to expect, would be the throwing of the engine and a portion of the train off the track. Was he to anticipate the bursting of the oil tanks, the oil taking fire, the burning oil running into and being carried down the stream; and the sudden rising of the waters of the stream, by means of which, in part at least, the burning oil set fire to the plaintiff's building? This would be a severe rule to apply, and might have made the defendant responsible for the destruction of property for miles down Oil creek. * * * It is manifest that the negligence was the remote and not the proximate cause of the injury to the plaintiff's building."

In S. S. Pass Railway Co. v. Trich, 117 Pa. 390, 11 Atl. 627, 2 Am. St. Rep. 672, the plaintiff was upon the rear platform of a street car and about to enter the same when the driver whipped up the horse to avoid a collision with a runaway horse and carriage. The abrupt jolt threw the plaintiff to the ground, when he was struck by the runaway and injured. The court held that a verdict for the defendant should have been directed. The court, through Mr. Justice Green, said:

"The utmost that can be said would be that such a consequence might possibly happen. But things or results which are only possible cannot be spoken of as either probable or natural. For the latter are those things or events which are likely to happen and which for that reason should be foreseen. Things which are possible may never happen, but those which are natural or probable are those which do happen, and happen with such frequency or

regularity as to become a matter of definite inference. To impose such a standard of care as requires, in the ordinary affairs of life, precaution on the part of individuals against all the possibilities which may occur, is establishing a degree of responsibility quite beyond any legal limitations which have yet been declared."

In Stone v. Boston & A. R. Company, 171 Mass. 536, 51 N. E. 1, 41 L. R. A. 794, the railroad company negligently stored oil upon a station platform. A teamster, not an employé, went to the platform to deliver goods and dropped a match on the platform, causing a fire which finally communicated to the plaintiff's building, about 75 feet from the point of origin of the fire. The court held the damages not proximate, and said:

"Was the starting of the fire by Casserly the natural and probable consequence of the defendant's negligent act in leaving the oil upon the platform? According to the usual experience of mankind, ought this result to have been apprehended? The question is not whether it is possible consequence, but whether it was probable; that is, likely to occur, according to the usual experience of mankind. That this is the true test of responsibility, applicable to a case like this, has been held in many cases, according to which a wrongdoer is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience. One is bound to anticipate and provide against what usually happens and what is likely to happen; but it would impose too heavy responsibility to hold him bound in like manner to guard against what is unusual and unlikely to happen, or what, it is sometimes said, is only remotely or slightly probable. A high degree of caution might, and perhaps would, guard against injurious consequences which are merely possible; but it is not negligence, in a legal sense, to omit to do so."

Accordingly in Gibson v. International Trust Company, 177 Mass. 100, 58 N. E. 278, 52 L. R. A. 928, the janitor of the defendant's building, while riding in the elevator, carelessly moved the stool of the elevator boy, who, not aware thereof, when he attempted to sit down, lost his balance, and, in saving himself from falling, clutched at the elevator lever, which started the elevator and injured a passenger. It was held that the act of the elevator boy in clutching the lever was the proximate cause of the injury, and not the act of the janitor in removing the stool.

Mr. Justice Miller in Insurance Company v. Tweed, 7 Wall. 44, 19 L. Ed. 65, after adverting to the rule of proximate and remote cause, said:

"One of the most valuable of the criteria furnished us by these authorities is to ascertain whether any new cause has intervened between the fact accomplished and the alleged cause. If a new force or power has intervened of itself sufficient to stand as the cause of the misfortune, the other must be considered as too remote."

In Milwaukee & St. Paul Railway Company v. Kellogg, 94 U. S. 469, 475, 24 L. Ed. 256, Mr. Justice Strong declared the rule as follows:

"The question always is: Was there an unbroken connection between the wrongful act and the injury a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? It is admitted that the rule is difficult of application. But it is generally held that, in order to warrant a finding that neg-

ligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances."

In Insurance Company v. Boon, 95 U. S. 117, 130, 24 L. Ed. 395, Mr. Justice Strong again recognized the principle that "when the causes are independent of each other, the nearest is, of course, to be charged with the disaster."

In Scheffer v. Railroad Company, 105 U. S. 249, 26 L. Ed. 1070, the executors of Charles Scheffer brought suit against the defendant railroad company for the death of said Scheffer, alleged to have resulted from a collision of railway trains, due to defendant's negligence. As a result thereof said Scheffer became disordered in mind and body, his brain and spine were affected, whereby his reasoning powers became impaired, and in eight months thereafter, as a consequence of illusions and forebodings over his condition, he committed suicide. It was held that the negligent act of the railroad company was not the proximate cause of Scheffer's death. After reaffirming the rule laid down in Railroad Company v. Kellogg, supra, Mr. Justice Miller said:

"Bringing the case before us to the test of these principles, it presents no difficulty. The proximate cause of the death of Scheffer was his own act of self-destruction. It was within the rule * * * a new cause, and a sufficient cause of death.

"The argument is not sound which seeks to trace this immediate cause of death through the various stages of mental aberration, physical suffering, and eight months' disease and medical treatment to the original accident on the railroad. Such a course of possible or even logical argument would lead back to that 'great first cause least understood,' in which the train of all causation ends.

"The suicide of Scheffer was not a result naturally and reasonably to be expected from the injury received on the train. It was not the natural and probable consequence, and could not have been foreseen in the light of the circumstances attending the negligence of the officers in charge of the train."

Without adverting to the accordant decisions of state and federal courts in other jurisdictions, it is sufficient to say that the rule above declared has been recognized and applied in this circuit. Railway Company v. Elliott, 55 Fed. 949, 5 C. C. A. 347, 20 L. R. A. 582. In the more recent case of Cole v. German Savings & L. Association, 124 Fed. 113, 59 C. C. A. 593, 63 L. R. A. 416, known as the "Elevator Case," the facts of which are quite familiar, Judge Sanborn reaffirmed the rule expressed in the syllabus:

"An injury that results from an act of negligence, but that could not have been foreseen or reasonably anticipated as its probable consequence, and that probably would not have resulted from it, had not the interposition of some new and independent cause interrupted the natural sequence of events, turned aside their course, and produced it, is not actionable, and such an act of negligence is the remote cause, and the independent intervening cause is the proximate cause, of the injury."

A discriminating observance of the foregoing distinction between the proximate and remote cause would have prevented some confusion in the authorities, and greatly simplified the solution of seemingly complicated facts of the particular case.

Turning to the case in hand, it may be conceded that the mineowner might be held to have reasonably anticipated that, permitting gas to flow in the mine, a workman exposed thereto might be overcome and rendered unconscious. It may also be conceded that it would not be an unnatural course to pursue by the men, on discovering the plaintiff prostrate in the mine, to carry him to the elevator as the shortest and quickest method of taking him to the surface for restoration. It may further be conceded, for the purposes of this case, that, with the knowledge the defendant had of the construction of the elevator and its mode of operation, a disabled man would, in the passage to the surface, be exposed to the usual and ordinary incidents of such mode of carriage. Beyond question, the defendant could be held liable for any injury to the lungs and the general health of the plaintiff traceable directly to his exposure to the gas. But here its responsibility would end. The elevator from side to side was about 5½ feet, nearly the length of an ordinary man. As it was square, there was ample room between the transverse corners in which the plaintiff could have been laid without his leg extending over the side of the elevator. And had he been, with ordinary care, laid crosswise at full length, his feet would not have extended outside of the elevator over two or three inches. In the absence of any knowledge, so far as this record discloses, on the part of the defendant that any person carried up the elevator had ever had his feet or legs injured by coming in contact with the wall of the shaft, would it be within the range of reasonable probability that the company should be held to have reasonably anticipated that the rescuers would so carelessly dump the plaintiff in the car as to leave his leg unnecessarily protruding beyond the elevator, and thereby be broken by coming in contact with the wall of the shaft?

It cannot be said that, if the plaintiff had not been rescued at the time he was, he would have died. The fact that Crozier, who lay above him, was dead, and that the plaintiff, whose face was to the ground, was still living, would indicate that the gas was not so deleterious next to the earth. And that the gas had measurably spent its destructive force at the time the plaintiff was discovered is evidenced by the fact that the rescuing party carried him out without inconvenience to themselves on account of the presence of gas, and that they returned thereafter and brought up the body of Crozier. The horse was also discovered near by and was led out the length of the tunnel by one of the employés, without injurious result. Suppose that the rescuing party had thought it the better course to have carried the plaintiff out to the open through the tunnel, and to that end had placed him on the ore car; but in their haste they left his leg hanging over the edge of the car, and the horse drawing the car towards the mouth of the tunnel had become frightened, or from viciousness, had kicked the plaintiff and broken his leg, would that have been a probable result that the defendant should be held to have reasonably anticipated from the plaintiff's exposure to gas in the mine? This very situation is aptly illustrated by the case of Roedecker v. Metropolitan Street Railway Company, 87 App. Div. 227, 84 N. Y. Supp. 300, where the plaintiff, under the direction of the conductor, rode on the front platform of a horse car. Through the negligence of the company re-

specting the track the horse fell, which stopped the car. The car was moved backward so that the horse could be released, and, when released, it kicked the plaintiff, who was standing on the platform. It was held that the driver's negligence ended with the fall of the horse, and therefore the injury was not the proximate cause of the negligent act. After adverting to the lack of harmony in the decisions, the court said:

"The principle to be evolved from their consideration is that, although a situation may be produced by negligence, it is only for injuries which probably, naturally, or necessarily flow from such negligence, without the intervention of another and a distinct cause or agency, that the author of the negligence can be held liable; and this would exclude injuries resulting from another, subsequent, different, and independent cause. * * * We must be careful to avoid confusing two things which are separate and distinct, namely, that which causes the injury, and that without which the injury could not have happened. * * * If, after the cause in question has been in operation, some independent force comes in and produces an injury, not its natural or probable effect, the author of the cause is not responsible."

When the plaintiff was carried to the surface of the mine, and the doctor had placed him on a table for examination, had some third party carelessly struck a leg of the table and overturned it, whereby the plaintiff's leg would have been broken, could it be said that that was the natural or probable result of the presence of gas in the mine, which the defendant should be held to have anticipated? The breaking of plaintiff's leg was such an abnormal, extraordinary incident, through the carelessness of the men who carried him up the elevator, as to exclude it from the range of reasonable probability as the result of the gas in the mine. It was a result that might not have happened in a thousand repetitions of the act of carrying him up the elevator. As well say, if his rescuers had abstracted his pocketbook or his watch, while he was comparatively unconscious and helpless, the defendant company should be held liable because he was rendered helpless by the gas, and that that was the first and continuing unbroken cause. The law is that in all the relations and transactions of business life we have a right to assume that others will perform their duty and discharge their undertakings in a reasonable, prudent, and careful manner. We are not held to assume that injury will come as the result of the carelessness or incautiousness of others.

The final contention on behalf of plaintiff in error is that the question of proximate and remote cause should have been submitted to the determination of the jury. Where the facts of the particular case are disputable, and are of such character that different minds might reasonably draw different conclusions therefrom, it presents a question of fact properly determinable by the jury; but where, as in this case, there is no dispute about the facts, and the law pronounces the judgment on the facts established, it is the province and duty of the court to direct the verdict. This has been so ruled in respect of this character of action. Hoag v. Lake Shore & M. S. Ry. Co., supra; S. S. Pass Ry. Co. v. Trich, supra; Goodlander Mill Company v. Standard Oil Company, 63 Fed. 400, 407, 11 C. C. A. 253, 27 L. R. A. 583; Cole v. German Savings & L. Association, supra.

The Circuit Court did not err in directing a verdict for the defendant, and its judgment is affirmed.