JENNINGS et al. v DAVIS.

(Circuit Court of Appeals, Fourth Circuit. May 13, 1911.)

No. 1,015.

1. MINES AND MINERALS (§ 121*)—DEGREES OF CARE—OPERATION OF PIPE LINE.

The owner of a pipe line used for the transportation of petroleum, the escape of oil from which may cause damage to the property of others, is not bound to the exercise of such a high degree of care as will absolutely prevent the leakage of such oil under any circumstances, but the measure of care required, as in all other cases, is that which would be exercised by a man of ordinary prudence under the same circumstances and conditions if the whole risk were his own.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 121.*]

2. MINES AND MINERALS (§ 125*)—EVIDENCE—HAPPENING OF ACCIDENT.

The mere fact that leakage in an oil pipe line was caused by the blowing out of a rubber gasket between the two parts of a joint does not

constitute evidence of negligence in the construction or operation of the pipe line or in the quality of the materials used, and the owner cannot be held liable for damage caused to the property of another by such leakage without evidence of negligence in one or the other of such particulars.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 125.*]

3. MINES AND MINERALS (§ 121*)—PIPE LINE—NEGLIGENCE.

Plaintiff owned buildings near defendants' pipe line, one of which was occupied by a third person as a blacksmith shop. The blowing out of a gasket from a pipe joint in the evening caused a leakage of oil which spread over the ground around and under plaintiff's buildings. When the blacksmith came to his shop in the morning there was oil under it, the floor being two feet from the ground, and also in front where he was compelled to walk through it. He started a fire, heated a piece of iron, and cut off a piece on the anvil, and allowed such piece, which was red hot, to fall through a crack in the floor where it set fire to the oil and plaintiff's buildings were destroyed. *Held* that, aside from any question of defendants' negligence, the act of the blacksmith, which was that of an independent intervening agent, for which defendants were not responsible, was negligent as matter of law, and was the proximate cause of plaintiff's loss.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 121.*]

4. NEGLIGENCE (§ 136*)—ACTIONS—QUESTIONS FOR JURY—PROXIMATE CAUSE OF INJURY.

While the question of the proximate cause of an injury is ordinarily one for the, jury, where the evidence is uncontroverted.· and but one inference should be drawn therefrom, the question is one of law for the court.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 300; Dec. Dig. § 136.*]

In Error to the Circuit Court of the United States for the Northern District of West Virginia, at Clarksburg.

Action by John W. Davis against E. H. Jennings and others, doing business under the firm name of the Producers' & Refiners' Oil Company. Judgment for plaintiff, and defendants bring error. Reversed.

Thos. P. Jacobs and Eugene Mackey, for plaintiffs in error.

John Bassel (Charles G. Coffman, on the brief), for defendant in error.

Before GOFF and PRITCHARD, Circuit Judges, and CONNOR, District Judge.

CONNOR, District Judge. This is an action on the case instituted in the circuit court of Wetzell county and removed into the Circuit Court of the United States for the Northern District of West Virginia. The purpose of the action is to recover damages sustained by the alleged negligence of· the plaintiffs in error, hereinafter called defendants, by the destruction of the property of defendant in error, hereinafter called plaintiff. The cause was duly brought to trial before the court and jury. From a judgment upon a verdict for plaintiff, defendants duly assigned error and brought the record to this court for review.

The facts, in regard to which there was no substantial controversy, disclose this case: Plaintiff was on and prior to December 8, 1903,

the owner of a dwelling used as a boarding house, a barn, and another house used as a blacksmith shop by some person not under the control of plaintiff. All of said buildings were located on a farm leased by plaintiff in Wetzell county, W. Va. Defendants, residents of the state of Pennsylvania, owned a pipe line used to convey petroleum oil from the place of production in Wetzell county to Pittsburg, Pa. They maintained a six-inch trunk oil pipe line laid along the north side of the public road upon the same side of which plaintiff, subsequent to the laying of the pipe line, built the houses described in the declaration. A mile or so west of said buildings, defendants maintained at West Grove a pumping station which forced the oil through the six-inch pipe into Pennsylvania, its final destination. At about 75 feet of plaintiff's house, defendants had inserted a Y joint, into which ran and connected a four-inch branch oil pipe line running off at an angle and in a northwesterly direction to Wileyville pumping station, distant about a mile from the Y connection. In the four-inch branch line, about five feet from the connection, was inserted a flange or joint, the two parts of which were drawn and fastened together with bolts, and for the purpose of making a close connection, which could not be made with the metal, a thin piece of rubber—from a sixteenth to a thirty-second of an inch in thickness and technically called a gasket—was inserted between the faces of the two halves of the flange. When the bolts were tightened, the rubber was flattened, and the connection made tight and safe. Between the flange and the Y connection, in the six-inch main line, was installed a gate or valve operated by a wheel on top, which, when turned, closed the valve and stopped the flow of oil through the four-inch line. Defendants employed a man whose duty it was to make daily inspections of the four-inch line and of this flange. The Wileyville pump station on the four-inch line and the Pine Grove station on the six-inch line could not be operated at the same time. The defendants operated the Wileyville station during the day, shutting it down about 6 o'clock in the evening, and operated the Pine Grove station during the night.

On the night of December 7, 1903, at about 8 o'clock, Mrs. Adams who in the absence of plaintiff looked after his boarding house, in stepping from the front porch of the house discovered oil upon the ground which came from a leak in the flange. She telephoned the operator at Pine Grove station that oil was escaping, and that it might result in serious injury or some serious accident. She testified that some one at the station at Pine Grove answered, requesting her to ascertain where the break in the line was—that she sent three men to look for the leak, and they informed her that it was in the four-inch line near the junction with the six-inch line—and that she immediately telephoned this information to the station. Mr. Maxwell testified that he had charge of the barn; that he reached there about 8 o'clock on the night of December 7, 1903, and discovered that oil was escaping and running around the house and barn to such an extent that he. regarded it as dangerous, and at once directed the outdoor lights between the barn and the house to be put out and directed that all lights and fires be kept out of the stables and from around the house; that

he at once telephoned the Pine Grove station, notifying the men there that oil was escaping, and that attention should be given the matter at once; that there was danger of burning the property; and that some one answered that they would have the matter looked after. There was evidence on the part of plaintiff that two persons at the house heard the pulsating or throbbing of the pump until late at night. Defendants' witness, Robert Rynd, testified that he was in the employment of defendants as one of the "Connection gang"; that he had made it his business to go over that line every day; that he was away on December 7, 1903, at other work, and did not get in until about 7:30 o'clock; that he went up the line before he ate supper to see that it was all right; that he went to the place of the leak, found oil on the ground; it was caused by the gasket blowing out of the flange—in the four-inch line—about four or five feet from the junction with the six-inch line; that there was a gate or valve between the flange and the six-inch line. He describes this as:

"A casting made on the same principle as the valve on a range. It has a stem, with a wheel on one end and a sliding valve at the other end. When you turn the wheel and open the valve, the oil goes through, and, when you turn it the other way, it closes the valve, so that nothing can get through. I closed the gate the first thing—tight—with a stick—that is, put a stick in the spokes of the wheel so that I could make it tight. It could not leak at all; it was impossible. The Wileyville pump station is on the four-inch line about half a mile away—perhaps a little more. This pump was not working when I got to the flange."

He said that he could not repair the leak that night very well, the oil made it dangerous, danger of igniting; that he went there the next morning shortly after 7 o'clock to repair the leak, took the line apart, took out the bolts, and put in a new gasket, screwed up the bolts, and tightened the flange. That, when he tightened up the valve the night before it took the pressure off the four-inch line. He estimates that about two of three barrels of oil leaked out before he got to the leak; that he had been going over the line daily to see that it was all right—that it was in good condition. He describes the gasket as a thin rubber packing—the thinner the better—that goes in between the flanges. He says that only a part of the gasket had blown out "about the size of a darning needle or may be not so large." It was very small—hardly noticeable. He said that there would be no throbbing—probably a little "sizzling noise"—just like water being forced out of a little hole. The other witnesses introduced by defendants corroborated this witness in regard to the construction of the pipe line, flange, gate, gasket, and its condition when examined, etc. Plaintiff introduced no testimony upon this phase of the case.

Rynd also testified that he went to plaintiff's house the next morning, saw the oil; that it ran "around below the house and then down along the line about 200 feet; that it stopped under the blacksmith shop, could see it on the ground and under the shop floor, about 2 feet from the ground." He also testified that he went to plaintiff's house the night of the 7th of December, saw woman there; that she told him the oil had been escaping and running under the house; that he knew this from what he saw at the line. "She said she had already called there, so I made sure and called there myself again to see if

they were shut down and they were. I called up Piney Grove." Nothing was done in regard to the oil that night. It was dark at half past 7; went there next morning at daylight. The uncontradicted testimony showed that on the morning of December 8th, at about 8 o'clock, the blacksmith, Cross, came to the shop and made a fire in his forge, and, for the purpose of shoeing a horse for a customer, heated a piece of iron, placed it upon the anvil and cut off a part of it, which fell on the floor, rolled through a crack into the oil under the shop, causing a fire which instantly followed the oil up to the barn and house, resulting in their destruction in a few minutes. It was shown by plaintiff's witness that, in order to get into the shop, he was compelled to step over the oil, as it ran under the floor—"it was a kind of jelly all around there"—that Cross came in the same way as witness, could not get in any other way. "He had to walk in it to get in the shop."

Winger, defendants' witness, says that he went to the shop about the time that Cross came, saw the oil, and told Cross not to put fire in his forge; that it was dangerous.

Bessey, another witness for defendants, says that he saw Cross lighting some shavings to start a fire in the forge as he passed the door —that he was using a match. "I told him it was not safe to build a fire in there until we had gotten the oil from under the shop—he turned his face to me and kind of smiled and went right on to building the fire." This witness was in defendants' employment.

Horner, another witness for defendants, says that he heard Winger tell Cross not to make a fire in the forge. Plaintiff's witness Hurley, who had brought the horse to be shod, says that he was there at the time Cross built the fire, and that he did not hear the witnesses tell him not to build the fire. Cross was not introduced.

At the conclusion of the testimony, defendants requested the court to instruct the jury to find for defendants, which was refused. Defendants excepted and assigned such refusal as error. Plaintiff asked the court to instruct the jury:

"That, where parties are handling or transporting substances that are liable to cause serious injury from explosion or by destroying property by reason of contact with fire, then the duty is devolved upon the person or persons handling or transporting such substances to use a degree of care in proportion to the risk or danger attending the handling or transportation of such substances."

Which was given, and defendants excepted and assigned error. The defendants requested the court to instruct the jury:

"If they find that the blacksmith, Cross, had knowledge of the existence of the oil about and under his shop, and of the danger of building a fire in his forge, and having such knowledge, did build a fire in his forge, and heat therein an iron until red hot, and cut therefrom a small piece, which falling through a crack in the floor, set fire to the oil underneath, the jury is instructed that such act of the blacksmith was negligence on his part, and was the intervening, efficient cause of the fire, and the plaintiff cannot recover, and the verdict of the jury must be for the defendants."

Which was refused, and defendants excepted and assigned error. Defendants further requested the court to instruct the jury.

"That if they find that the building of a fire in the blacksmith's shop and the heating therein of the horseshoe and cutting the same off and permitting the same to fall, in red hot condition, into the escaped oil on the ground under the shop and that the fire which burned plaintiff's property ignited therefrom, that the said acts of said blacksmith are the proximate cause of the fire, and plaintiff cannot recover."

This was refused and defendants excepted. Defendants requested the court to instruct the jury:

"That, if they find from the evidence that the negligence of the blacksmith was the proximate cause of plaintiff's injury and damage, then there can be no recovery against defendants."

This was refused and defendants excepted and assigned error.

Other requests for instruction were refused, but, in the view which we take of the case, those set forth with the instructions given present the material contention of the defendants.

[1] The record does not present the question discussed and decided in Rylands v. Fletcher, L. R., 3 H. L. 330, as modified by Nichols v. Marsland, L. R., 10 Exch. 255, because no damage resulted from the fact that the oil escaped and run upon the plaintiff's premises. The action is not for damage sustained by the trespass, but for the injury which resulted from the ignition of the oil on the premises. The defendant company was not guilty of a nuisance in maintaining its pipe lines. It was engaged in a legitimate business. Hence the doctrine of "absolute care," or, as sometimes expressed, the "wild beast" theory, is not applicable. Beven, Neg. 399. Liability is therefore dependent upon the existence of negligence, which may arise either by defective construction of the pipe and connections or failure to make a proper inspection. The measure of duty in such cases is well stated in Gas Co. v. Wellman, 114 Ky. 79, 70 S. W. 49, 1 Am. & Eng. Ann. Cas. 64, citing Nichols v. Marsland, supra. "If the person who has collected the water has done all that reasonable care and skill can do, he is not liable for damages over which he has no control, and that a distinction must be drawn between the keeping of a tiger or other dangerous wild beasts which get loose accidentally or by the fault of others, and a reasonable use of property in a way beneficial to the community. * * * The authorities lay down the rule that, as gas is a useful article, almost indispensable in modern life under many circumstances, the manufacture and sale of it is not an illegal act, and that the company in supplying this necessity to its customers is bound only to exercise such care and skill in its management as the dangerous character of its substance, and the attending circumstances, demand of a person of ordinary prudence." Goodlander Mill Co. v. Standard Oil Co., 63 Fed. 400, 11 C. C. A. 253, 27 L. R. A. 583. It will be observed that the learned judge instructed the jury that the law imposed the duty "to use a degree of care in proportion to the risk of danger attending the handling or transportation of such substances." While we are quite sure he did not so intend, the language quoted is capable of being interpreted by the jury as calling upon the defendant to use such a degree of care to prevent leaks as was necessary to accomplish that result, under all conditions. The correct rule,

as laid down by the Supreme Court of the United States, and by a very large majority of the courts of the states, is that:

"Negligence has always relation to the circumstances in which one is placed, and what an ordinarily prudent man would do or omit in such circumstances." Charnock v. Texas Pac. Ry. Co., 194 U. S. 432, 24 Sup. Ct. 671, 48 L. Ed. 1057.

The standard of duty is that of the conduct of a reasonable and prudent man. "The duty is dictated and measured by the exigencies of the occasion." Railroad v. Jones, 95 U. S. 439, 24 L. Ed. 506. Referring to the authorities, Mr. Justice Field in Nitro Glycerine Case, 15 Wall. 524, 21 L. Ed. 206, says:

"The rule deducible from them is that the measure of care against accident, which one must take to avoid responsibility, is that which a person of ordinary prudence and caution would use if his own interests were to be affected, and the whole risk were his own." 14 Am. & Eng. Enc. 936.

Tested by these principles, we think it very doubtful whether any sufficient evidence of a breach of duty on the part of defendant is disclosed by the record. There is no suggestion that the construction of the pipe line or the method of making the connection was improper or unscientific; nor that the gasket was not the usual and proper method of securing a perfect and safe connection. Unless the fact that it "blew out" as testified to was of itself evidence of either defective material or unusual pressure, or negligent absence of inspection, imposing upon defendant the duty to explain the leakage, or, in other words, that the fact of leakage brought the case within the doctrine of res ipsa loquitur, the plaintiff failed to show any breach of duty on the part of defendant.

[2] We are of the opinion that the mere fact that a leakage was caused by the blowing out of the gasket does not constitute evidence of negligence in the construction, operation, or quality of the materials used. The testimony fails to discover any negligence in regard to inspection, or prompt correction of the condition which caused the leak. In this connection defendant requested the court to instruct the jury:

"That, if they shall find from the evidence that the blowing out of the gasket was an unforeseen and unavoidable accident, they must find for the defendant."

This request was refused, and such refusal is assigned for error. The refusal to give this instruction deprived the defendant of a defense to this aspect of the case to which it was entitled. It was equivalent to holding the defendant to the absolute duty to prevent leakage; in other words, an insurer against accident. Conceding this to be true, plaintiff insists that, after defendant's employés were notified that the oil had escaped and run upon the premises, the duty was imposed to either promptly remove it, or by covering it with dirt to prevent its being ignited by the usual and legitimate use of the premises. In this we concur. The evidence tends to show, without contradiction, that it would have been impracticable and dangerous to interfere with the oil as it had run upon the ground on plaintiff's premises during the night. Whether defendant under the circum-

stances should · have placed a watch upon the premises during the night, is immaterial, as no injury resulted from its failure to do so.

[3] We are thus brought to consider the determinative question presented by the record. Assuming that defendant was negligent in failing to cover the oil, or remove it, at the earliest practicable time, and that, by permitting it to remain in the condition described on the following morning, it was liable for any injury to the premises which proximately resulted from the condition produced by the presence of the oil, the question arises, was the ignition of the oil, under the circumstances disclosed, a natural and proximate result of such condition, or was it the result of the act of an intervening, independent agent? Defendants' prayers are based upon the assumption that the jury find that the blacksmith, Cross, had knowledge that the oil had run under the shop, and, with such knowledge, built a fire in the forge, heated a piece of iron, placed it on the anvil, and cut therefrom a small piece which fell upon the floor and through a crack therein, coming in contact with the oil under the shop ignited it, and thereby caused the destruction of plaintiff's property. It will be observed that the prayers involve the finding that the blacksmith was not only an intervening, independent agent, but that he was negligent, in that he knew of the conditions which rendered it dangerous to pursue the course which resulted in the injury. The appearance of the oil at the time the blacksmith reached his shop early on the morning of December 8th and his conduct are disclosed by plaintiff's evidence. The only controverted testimony relating to this phase of the case is that of defendants' witness, who says that he told Cross not to make a fire in the forge—that it was dangerous—and the evidence of plaintiff's witness, who was present, and says that he did not hear the warning. Cross was not introduced. Assuming that no warning was given him, we have the uncontradicted testimony of plaintiff's witnesses that, when Cross reached the blacksmith shop, he could not go into it without seeing the oil on the ground and that "he had to walk in it to get into the shop," that he therefore knew the conditions when he made a fire, heated and cut the iron. It would seem that no two reasonable minds could differ in reaching the conclusion that this was a dangerous thing to do—certainly the conditions, in the light of which he was acting, imposed upon him the duty to use ordinary care to avoid the danger of igniting the oil under the shop. Every person on the premises recognized and met this duty from the moment the oil was found to be on the premises. It would seem to be clear that Cross was guilty of negligence. This fact does not, however, necessarily exonerate defendants. His negligence may have been only concurrent with that of defendants, and both may be liable.

The question therefore remains whether the negligence of Cross was the proximate cause of the injury—that is, whether his negligence intervened and insulated the defendants' negligence. In the solution of this question recourse must be had to certain well settled principles. Every one guilty of negligence is liable for all damage which proximately results therefrom, whether anticipated by him or not. The question of reasonable anticipation of the particular injury

which his negligent breach of duty produces is not open to him. Where one is guilty of a breach of duty resulting in injury to another, to whom he owed the duty, "in the absence of a sufficient and independent cause operating between the wrong and the injury, the original wrong must be considered as reaching to the effect, and proximate to it." Railroad v. Kellogg. 94 U. S. 469, 24 L. Ed. 256. When. however, it is suggested that some independent cause intervened between the wrong, and the injury complained of, other principles must be invoked. Mr. Justice Strong, in Railroad v. Kellogg, supra, states the principle clearly. He says:

"The question always is: Was there an unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? It is admitted that the rule is difficult of application, but it is generally held that, in order to warrant a finding that actionable negligence or an act not amounting to wanton wrong is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of attending circumstances."

Confusion sometimes arises, and is found, in decided cases, regarding the doctrine of anticipated results of negligence. If from my negligent act or omission of duty injury results, in the absence of any intelligent, responsible, intervening cause, the law attributes the injury to my negligence, and I will not be heard to say that I did not anticipate that the particular injury would result from my wrongful act or breach of duty. In such cases the question is simple and the liability easily settled. If, however, between my breach of duty and the injury, some other agency—either wrongful or otherwise—intervene, and I seek to escape liability, and fix it upon such intervening agency, the question arises whether or not I shall be held to have reasonably anticipated the intervention or the existence of the condition, from which the injury resulted, and at this point the doctrine of prevision or anticipation enters into the problem, or, as said in Kellogg's Case, "where there is a sufficient and independent cause, operating between the wrong and the injury the resort of the sufferer must be to the originator of the intermediate cause. The inquiry must therefore always be whether there was any intermediate cause disconnected from the primary fault and self operating which produced the injury." Kellogg's Case, supra. If the intermediate cause is one which the negligent party should have reasonably anticipated, it is not "disconnected." Dr. Wharton, after stating the general principle, says:

"Reserving for another point the consideration of consequences resulting from the indefinite extension of vicarious liability, we may now ask whether, on elementary principles, the action of an independent free agent, taking hold unasked, of an impulse, started by us. and giving it a new course, productive of injury to others. does not make him the juridical starting point of the force so applied by him; so far as concerns the party injured? For the spontaneous action of an independent will is neither the subject of regular, natural sequence nor of accurate precalculation by us." Whart. Neg. 138.

"If the intervening cause be of such a nature that it would be unreasonable to expect a prudent man to anticipate its happening, he will not be responsible for damage resulting solely from the intervention." Barrow's Neg. 17.

The latest English writer on negligence, after a careful review of the decided cases, says:

"The principle that to fix liability for injuries brought about through a complicated state of facts, the last conscious agency, must be sought and the consideration that, if between the agency setting at work the mischief and the actual mischief done, there intervenes a conscious agency which might or should have averted mischief, the original wrongdoer ceases to be liable." Beven, Neg. 53.

In Scheffer v. Railroad Co., 105 U. S. 249, 26 L. Ed. 1070, plaintiff's intestate while a passenger was injured in a sleeping car. It was alleged that by reason of the injuries sustained he became insane and committed suicide. Sustaining a demurrer to the declaration, Mr. Justice Miller said:

"The suicide of Scheffer was not a result naturally and reasonably to be expected from the injury received on the train. It was not the natural and probable consequence, and could not have been foreseen in the light of the circumstances attending the negligence of the officers in charge of the train."

In Cole v. German, etc., Soc., 124 Fed. 113, 59 C. C. A. 593, 63 L. R. A. 416, Sanborn, Circuit Judge, in an exhaustive and well sustained opinion, says:

"An injury which could not have been foreseen, nor reasonably anticipated is not actionable, and such an act is either the remote cause, or no cause whatever of the injury." Fawcett v. Railroad Co., 24 W. Va. 759; Teis v. Smuggler Mining Co., 158 Fed. 260, 85 C. C. A. 478, 15 L. R. A. (N. S.) 893.

In Railway v. Calhoun, 213 U. S. 8, 29 Sup. Ct. 322, 53 L. Ed. 671, Mr. Justice Moody says:

"The law in its practical administration in cases of this kind regards only proximate or immediate, and not remote, causes, and in ascertaining which is proximate and which remote refuses to indulge in metaphysical niceties. Where in the sequence of events between the original default and the final mischief an entirely and unrelated cause intervenes, and is of itself sufficient to stand as the cause of the mischief, the second cause is ordinarily regarded as the proximate cause, and the other as the remote cause. This is emphatically true where the intervening cause is the act of some person unrelated to the original actor. * * * If the misconduct is of a character which, according to the usual experience of mankind, is calculated to invite or induce the intervention of some subsequent cause, the intervening cause will not excuse him, and the subsequent mischief will be held to be the result of the original misconduct. This is upon the ground that one is held responsible for all the consequences of his act which are natural and probable, and ought to have been foreseen by a reasonably prudent man."

There being no such relation between the blacksmith and plaintiff as would make the latter responsible for the former's negligence, there is no element of contributory negligence involved. Cross was, in respect to both parties, an independent, unrelated agent. His act was negligent. The sole question, therefore, is whether such negligence was concurrent or independent of that of the defendants and this depends upon whether defendants ought reasonably to have foreseen or anticipated that he would go to the shop in the early morning—see the oil as it lay upon the ground and ran under the shop—light the fire—heat the iron—cut off a piece in such way as to cast a part, red hot, upon the floor, in which was a crack, through which it would

probably fall into the oil producing the result for which it is sought to hold them liable. There is no suggestion that defendants' employés knew that the building was used as a blacksmith shop or of Cross' habit in the use of it, unless we take the testimony of defendants' witness and this is, upon the plaintiff's theory, to be eliminated. We are of the opinion that, taken in the aspect most favorable for plaintiff, the act of Cross was that of an independent, intervening agent for which defendants were not responsible, and therefore the proximate cause of the destruction of the property. The learned judge instructed the jury, among other things:

"That if they believed from all the evidence in the case, and the circumstances disclosed by such evidence, that the blacksmith, Cross, with full knowledge of the danger, negligently and without proper care, caused the piece of hot iron to ignite the oil underlying his shop, then his act would be the intervening cause; but, if the jury believe from the evidence that such act was not negligently, and without proper care, done, it would not constitute such intervening cause and as to this the jury alone must determine from the evidence."

[4] In the view which we take of the uncontroverted testimony, the conduct of Cross was negligent. While it is true that ordinarily the question of proximate cause is for the jury, it is equally true that, where the evidence is uncontroverted and but one inference should be drawn, the question is one of law for the court. The record brings the case within this principle. Cole v. German Sav. & Loan Co., 124 Fed. 113, 59 C. C. A. 593, 63 L. R. A. 416; Teis v. Smuggler Mining Co., 158 Fed. 260, 85 C. C. A. 478, 15 L. R. A. (N. S.) 893.

For the reasons set out, we are of the opinion that the judgment should be reversed and a new trial ordered.

Reversed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes