## GOODLANDER MILL CO. v. STANDARD OIL CO.

(Circuit Court of Appeals, Seventh Circuit. May 31, 1894.)

### No. 60.

NEGLIGENCE—REMOTE AND PROXIMATE CAUSE.

Defendant shipped a car load of crude petroleum in a car which had no valve regulating the outflow of the oil. The consignee had the car removed to a side track, and then, with knowledge that the car was leaking, attempted to draw off the oil near plaintiff's mill, the engine room of which was lower than the track. Owing to the absence of the valve, the oil ran out so rapidly that it flowed into plaintiff's engine room, exploded, and destroyed the mill. *Held*, that defendant was not liable therefor, since its negligence was not the proximate cause of the injury.

In Error to the Circuit Court of the United States for the Northern District of Illinois.

Action on the case by the Goodlander Mill Company against the Standard Oil Company. Defendant obtained judgment. Plaintiff brings error.

In November, 1887, the defendant shipped in a tank car from Lima, Ohio, to the Ft. Scott Gas Company, at Ft. Scott, Kan., some 6,000 gallons of crude petroleum, deliverable to that company at East St. Louis. The tank car had a discharge pipe in the bottom and about the center of the tank, some four inches in diameter, and projecting about six inches below the bottom. The projection was threaded to receive a heavy cap screw. Within the tank the discharge pipe is fitted with a heavy valve to prevent the escape of oil. The valve rests upon a shoulder in the upper part of the discharge pipe. Below the shoulder there are four concaves made in the valve, to permit the flow of oil upon raising the valve. An inflexible iron rod is attached to the valve, extending through the dome on the top of the tank, and projecting a foot or more above it. Within the tank at the top there is a coiled wire spring, arranged to hold the rod down, and keep the valve in position, closing the outlet. To discharge the contents of the car through the lower discharge pipe, the cap is unscrewed and the pipe coupling attached. The valve, by means of the rod, is then lifted, and the oil permitted to flow through the outlet into the pipe, and conducted to the reservoir provided for its reception. The tank car arrived at Ft. Scott on the 17th of November, and was received by the consignee on the next day. The gas company caused the car to be removed from the yard of the railroad company, where it was delivered, and to be placed upon the switch track of another company located in a street a half mile away, between the property of the gas company and the steam flour mill of the plaintiff in error. This was done for the purpose of piping the petroleum contained in the tank into the reservoir of the gas company, located beyond the mill, and upon the further side of an intercepting street. The railroad track upon which the tank car stood was three feet distant from the furnace room of the mill, the latter being three feet below the level of the railroad track at that point. The car was placed directly opposite the window of the furnace room of the mill. On the afternoon of the 18th of November, and before or at the time of the removal of the car on that day it was observed by the engineer of the switch engine that the tank was leaking, the oil dripping at the outlet under the car, and forming a pool upon the ground. On the morning of the 19th of November, two servants of the gas company undertook to discharge the oil into the reservoir of the gas company, through a pipe laid from the reservoir to the tank car. One of them examined the rod at the top of the car, and reported to the other that it was pushed down, indicating the valve to be in proper position. The other went under the car with a wrench to remove the cap, and attach the pipe leading to the reservoir. He observed that the cap was loose, and re-

moved it with his hand; and it is stated in the brief of counsel for plaintiff in error—without reference to the record for verification of the statement—that this man observed, as he went under the car for the purpose of removing the cap and attaching the coupling, that the oil was leaking some, but that he did not deem the fact of moment, supposing that the valve was in its proper position, and would prevent the discharge of the petroleum until it was raised. Upon removing the cap, the oil flowed out before the coupling could be attached; and despite the efforts made to prevent, and before the car could be removed from its position, the oil flowed down the descent, through an open window, into the boiler room, and also upon some hot ashes located at the rear of the engine room and boiler house, and some eight feet distant from the car, and caught fire, whereby the mill and its contents were destroyed, and property of the value of about $107,000 consumed. After the fire and upon examination of the tank, it was discovered that it contained no valve; that it had been removed, but how or when is not disclosed by the evidence, but presumably before the tank car was filled with the oil for shipment. The evidence established that crude petroleum oil will give off a vapor or gas which will flash at a temperature of 90°, igniting by contact with fire, and explosive in its ignition; that it is in common use for fuel purposes; and that it is about as volatile as turpentine. The action against the Standard Oil Company by the mill owner is predicated upon negligence in omitting to have a proper valve in the outlet of the tank. At the trial of the cause, and upon the conclusion of the evidence for the plaintiff, the court directed the jury to find a verdict in favor of the defendant.

Myron H. Beach, for plaintiff in error.
W. G. Ewing and Virgil P. Kline, for defendant in error.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

JENKINS, Circuit Judge (after stating the facts). Without doubt, whether a given act or omission is the proximate cause of an injury is ordinarily a question for a jury. Railway Co. v. Kellogg, 94 U. S. 469. This, however, is subject to the well-settled rule that the court should withdraw a case from the jury, and direct a verdict, when the undisputed evidence is so conclusive that the court should set aside a verdict in opposition thereto. North Pennsylvania R. Co. v. Commercial Nat. Bank, 123 U. S. 727, 733, 8 Sup. Ct. 266; Railroad Co. v. Converse, 139 U. S. 469, 472, 11 Sup. Ct. 569; Elliott v. Railway Co., 150 U. S. 245, 14 Sup. Ct. 85; Railway Co. v. McDonald, 152 U. S. 262, 14 Sup. Ct. 619. The ruling directing a verdict upon the evidence presented by the plaintiff sanctions a review of that evidence here, to enable us to determine whether, as matter of law, upon the testimony adduced, a verdict for the plaintiff could have been sustained. Bag Co. v. Van Nortwick, 9 U. S. App. 25, 3 C. C. A. 274, 52 Fed. 752.

We are confronted, therefore, with certain questions, always interesting and often perplexing, touching the law of negligence,—whether, upon the facts stated, the defendant stood in breach of duty to the plaintiff, and whether the omission to provide a valve for the discharge pipe of the tank was the proximate cause of the destruction of the plaintiff's mill.

It is not every one who suffers loss from another's negligence that may recover therefor. Negligence, to be actionable, must occur in breach of a legal duty, arising out of contract or otherwise,

owing to the person sustaining the loss. Kahl v. Love, 37 N. J. Law, 5; Bank v. Ward, 100 U. S. 195. Mr. Wharton defines "legal duty" to be "that which the law requires to be done or forborne to a determinate person, or to the public at large, and as correlative to a right vested in such determinate person or in the public." Whart. Neg. § 24. There was here no contractual relation between the parties. Any duty arising out of the contract was due to the gas company, not to the plaintiff. If, by reason of the shipment of the petroleum, a legal duty arose in favor of the plaintiff, it was a duty distinct and apart from the contract,—a duty implied by law. The duty, then, upon which the plaintiff must rely, was a duty owing by the defendant to the public. The law imposes the obligation that one should so use one's property that injury should not result therefrom to another. This duty, however, is not absolute; but one is responsible for negligent use, for failure to do or forbear that which the law requires to be done or forborne in respect of the use. If the failure to provide a valve was in breach of a duty owing to the public, it must be because the character of the shipment was such and so dangerous that the defendant owed the duty to all who might in any way be brought in contact with it, to so protect and guard it that harm therefrom should come to no one. One who uses a dangerous agency does so at his peril, and must respond to the injuries thereby occasioned, not caused by extraordinary natural occurrences, or by the interposition of strangers. Fletcher v. Rylands, L. R. 1 Exch. 265, 279, affirmed L. R. 3 H. L. 330. The books are replete with cases falling within and illustrating this principle. Thus, in Thomas v. Winchester, 6 N. Y. 397, an apothecary carelessly labeled a poison as a harmless medicine, and sent it so labeled into the market. He was held liable to all who, without fault on their part, and in consequence of the false label, were injured by its use. Norton v. Sewall, 106 Mass. 143; Bishop v. Weber, 139 Mass. 411, 1 N. E. 154; Davis v. Guarnieri, 45 Ohio St. 470, 15 N. E. 350,—are like cases.

The rule is limited, however, and justly so, to instruments and articles in their nature calculated to do injury, such as are essentially and in their elements instruments of danger; to acts that are ordinarily dangerous to life or property. Loop v. Litchfield, 42 N. Y. 351, 357. And so, where the wrongful act is not immediately dangerous to the life or property of others, the negligent party is liable only to the party with whom he contracted. Collis v. Selden, L. R. 3 C. P. 496, cited with approval in Bank v. Ward, 100 U. S. 195, 204. Thus, in Davidson v. Nichols, 11 Allen, 514, the defendant, a wholesale druggist, negligently delivered to a customer sulphide of antimony for black oxide of manganese. The purchaser, a retail druggist, delivered the package unopened to the plaintiff, both supposing the substance to be black oxide of manganese. In that belief the plaintiff proceeded to use the same in combination with chloride of potassium,— a substance with which the oxide may be safely and properly used, but from the combination of which with sulphide of antimony a dangerous explosion follows. The plaintiff was injured by the resulting explosion, and brought suit.

The court held the defendant not liable; and, after declaring that there existed no privity of contract between the parties, says:

"We think it equally clear that the plaintiff shows no cause of action ex delicto against the defendant. The insuperable difficulty is that the averments in the declaration do not disclose any duty or obligation which rested on the defendants towards the plaintiff in the sale of the article to the person from whom the plaintiff purchased. As has been already stated, it was an innocuous substance, which became dangerous only when used in composition with another chemical agent. It was not sold by them with any knowledge or understanding of the purpose for which it was intended to use it, nor did they know that it was to be resold to the plaintiff. There being no duty imposed on the defendants towards the plaintiff arising out of any contract, this action is to be maintained, if at all, by showing a breach of some duty or obligation imposed on them by law. They have been guilty of no actionable carelessness or negligence, unless it can be shown that they were bound to use some care or caution upon which the plaintiff has right to rely. Failing to show this, or to aver a state of facts from which the law would imply it, the gist of this action, which is founded on alleged negligence and want of due care, is wholly wanting. We know of no rule or principle of law by which a vendor of an article can be held liable for mistakes in the nature or quality of an article arising from his carelessness and negligence, which causes loss or injury to other persons than his immediate vendee, where there has been no fraudulent or false representation in the sale, and the article sold was in itself harmless; especially where the sale is made without any notice to the vendor that the article was bought for a third person, or that it was intended to be used in combination with other substances which may make it dangerous or injurious to person or property. In such case a vendor assumes no responsibility, and incurs no liability beyond that which results from his contract with his vendee. With remote vendees of the article, who purchase it by subsales from those to whom it was originally sold, he enters into no contract, either express or implied, and takes on himself no obligation or duty whatever. Nor has he done any wrongful or illegal act towards third persons for the consequences of which he is liable. The general principle applicable to this class of cases is that a vendor takes upon himself no duty or obligation other than that which results from his contract. For breach of this, he is liable only to those with whom he contracted. All others are strangers. The law fastens on him no general or public duty arising out of his contract for the breach of which he can be held liable to those not in privity with him."

And so in Losee v. Clute, 51 N. Y. 494, the manufacturer of a steam boiler constructed it improperly and of poor iron, knowing that it was to be used in the vicinity of and adjacent to dwelling houses and stores; so that, in case of an explosion while in use, there would be likely to be destruction to human life and adjacent property. After delivery and acceptance by the purchaser, and while in use by him, an explosion occurred, in consequence of such defective construction, to the injury of a third person. It was held that the latter had no cause of action against the manufacturer.

In Bailey v. Gas Co., 4 Ohio Cir. Ct. R. 471, the defendant, under contract with another, put in fixtures for using natural gas for heating a steam boiler connected with an engine in the electric plant of that other. By reason of negligence and imperfect construction of the fixtures, an explosion ensued, and the engineer in charge of the boiler and engine was injured, and brought suit. It was held that there was no contract relation between the plaintiff and the defendant, and that the defendant owed him no duty. It was there conceded that gas, under certain circumstances, might

be a dangerous article; that it was explosive when allowed to escape so as to come in contact with flame. It was not in and of itself dangerous. And the defendant was acquitted, although the imperfect fixtures were placed by it for the purpose of being used in connection with the use of gas as fuel. See, also, Blakemore v. Railway Co., 8 El. & Bl. 1035; Burdick v. Cheadle, 26 Ohio St. 393; Roddy v. Railway Co., 104 Mo. 234, 15 S. W. 1112; Curtin v. Somerset, 140 Pa. St. 70, 21 Atl. 244.

There is a class of cases of which Heaven v. Pender, 11 Q. B. Div. 506, and Devlin v. Smith, 89 N. Y. 470, are examples, holding the builder of a scaffolding to be used by workmen, and negligently constructed, rendering it unsafe, liable for an injury occurring from its use. These cases recognize the rule that the liability of the builder is in general only to the person with whom he contracted, but rest liability to third persons upon the ground that the defect was such that it rendered the article in itself immediately dangerous, and that serious injury was the natural and probable consequence of its use. Of the same character is the case of Necker v. Harvey, 49 Mich. 517, 14 N. W. 503, holding the constructor of an elevator, while in possession of and operating it, liable to a stranger for injuries arising from its negligent and unsafe construction; otherwise, if possession had been surrendered.

We are thus brought to the question whether crude petroleum may properly be classified as a "dangerous agency," within the meaning of the rule. It is an extensive article of commerce, transported by rail to all parts of the land, shipped in steamers and sail vessels to all parts of the world. It is innocuous of itself. It is dangerous only when in considerable quantity it is brought in contact with fire. It is in general use for fuel and other purposes. It is no more volatile than turpentine, no more explosive than gas; does not necessarily, in its handling, involve imminent danger to any one. It is not a dangerous agency of itself, but becomes such by subjection to a high degree of heat, or from actual contact with fire. The shipment of such an article of commerce casts upon the shipper a certain duty to the public,—that of providing a suitable vehicle for the petroleum in all respects adapted to the purposes of carriage, and able to encounter the usual risks of transportation, so that the petroleum in its transit should not be exposed to danger of ignition from causes incident to its transportation, reasonably to be anticipated. We think that to be the true limit of the shipper's duty, and that duty, as it appears to us in this case, was properly discharged. The petroleum was contained in a tank impervious to fire. The shipment reached its destination in safety. The case is not like that of the shipment of explosives, the character of the shipments being concealed. Brass v. Maitland, 6 El. & Bl. 470; Farrant v. Barnes, 11 C. B. (N. S.) 553; The Nitro-Glycerine Case, 15 Wall. 524. Here the contents of the tank were declared by the peculiar construction of the car. The properties of the petroleum were known to the consignee and to the public equally with the defendant. They are matter of common knowledge. There was here no disguise and no concealment.

It may be said that it was the duty of the shipper so to equip the car that its contents might be safely discharged in ordinary methods and by the exercise of due care. This we may concede. It was a duty, however, growing out of the contract, and owing to the consignee; and, for failure therein, the shipper would be liable to the consignee for the damages naturally and proximately flowing from such failure. That duty, however, was not owing to the plaintiff, the material shipped not being in and of itself essentially dangerous.

The proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred.

In Insurance Co. v. Boon, 95 U. S. 117, 130, the court says:

"The proximate cause is the efficient cause,—the one that necessarily sets the other causes in operation. The causes that are merely incidental, or instruments of a superior or controlling agency, are not the proximate causes and the responsible ones."

The remote cause is that cause which some independent force merely took advantage of to accomplish something not the probable or natural effect thereof. The absence of the valve was doubtless, in a sense, a cause of the injury,—an antecedent cause; but, where the negligent act is not wanton or malum in se, the law stops at the immediate, and does not reach back to the antecedent, cause. The causal connection between the negligence and the hurt is interrupted by the interposition of an independent human agency; and, as Mr. Wharton expresses the thought, "the intervener acts as a nonconductor, and insulates the negligence." The test is: Was the intervening efficient cause a new and independent force, acting in and of itself in causing the injury and superseding the original wrong complained of, so as to make it remote in the chain of causation, although it may have remotely contributed to the injury as an occasion or condition? Here the gas company gave the negligent act a mischievous direction. If but for such interposition the defendant's negligence would have produced no injury, the causal connection is broken, because the intervening act made the act of negligence, otherwise innocuous, operative to injury. The injury must be the natural and probable consequence of the negligent act, and such as ought to have been foreseen in the light of attending circumstances. Railway Co. v. Kellogg, 94 U. S. 469. There the court says:

"The question always is, was there an unbroken connection between the wrongful act and the injury,—a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury?"

The negligent omission of the valve did not necessarily set the other causes in operation. It was, in the language of the Boon Case, above referred to, the incidental cause, or the instrument of a superior and controlling agency, and was therefore not the proximate and responsible one. If the owner of a magazine in which

gunpowder is stored should carelessly leave open its door, and a responsible human being should enter with a lighted candle, knowing of the presence of the gunpowder, and an explosion should ensue, could it be affirmed that in any legal sense the careless act of leaving open the door was the cause of the explosion? So here the gas company had received this oil into its possession. It was entirely harmless in and of itself. The natural and probable consequence of the negligent act of omission charged upon the defendant was the leakage and loss of the oil. The omission of the valve did not render it dangerous. If not interfered with, the omission of the valve had no tendency whatever to produce the injury complained of. The petroleum was subject to ignition, and its ignition at the time and place produced the injury. That was caused by subjecting it to contact with heat and fire. That was done by the gas company, which had possession and control of the oil, and acted independently, and not under the direction of the defendant. The company was chargeable with knowledge of the properties of petroleum, and had actual knowledge, through its servants, that the oil was leaking from the discharge pipe, and this prior to the removal of the car from the yards of the carrier. With this knowledge, the company placed the car within three feet of the engine and boilers of a mill located below the grade of the railway, and with knowledge of the leakage, sufficient, in view of the dangerous proximity of fire, to place a careful person upon diligent inquiry, undertook to discharge the oil in close proximity to hot ashes, and near an open window of the boiler room. We cannot say that the negligent omission of the valve "necessarily set the other causes in operation;" nor can we say that the injury was the natural and probable consequence of the negligent act. In marshaling the probable consequences which ordinary sagacity should have foreseen as probably resulting from the omission of the valve, it would, as we conceive, appear unlikely and abnormal that this injury should result. We are of opinion that the intervening and independent act of the gas company was the efficient cause, self-operating, by which the negligent act of the defendant was rendered effective to an injury that was not the probable and natural consequence of the act. Hoag v. Railway Co., 85 Pa. St. 293; Carter v. Towne, 98 Mass. 567; Scheffer v. Railroad Co., 105 U. S. 249; St. Louis, I. M. & S. Ry. Co. v. Commercial Union Ins. Co., 139 U. S. 223, 11 Sup. Ct. 554.

The cases to which we are referred are not in conflict with the principles asserted, and are quite distinguishable in the facts from the case at bar. In Railway Co. v. Keighron, 74 Pa. St. 316, the negligent act of the company's servant caused a collision which set fire to the cars of a train, which fire directly communicated to and destroyed plaintiff's house, situated within 20 feet of the track. There the negligent act was immediately dangerous, and there was no intervening cause between the negligence and the injury. In Lynn Gas & Electric Co. v. Meriden Fire Ins. Co., 158 Mass. 570, 33 N. E. 690, a fire occurred in the wire tower of the plaintiff's building, through which the wires for electric lighting were

carried from the building. The fire was extinguished without contact with other parts of the building, and with slight damage to the tower or its contents. By reason of the fire, a connection was made between the lightning arresters, causing a short circuit; and the short circuit resulted in an extra strain upon the belt through the action of electricity, thereby causing, in a part of the building remote from the fire and untouched thereby, a disruption of the fly wheel of the engine and other damage. It was held, and justly so, that there was unbroken connection between the fire and the injury, and without the intervention of a new cause acting from an independent source.

We are of opinion that if, upon the facts presented, a jury had rendered a verdict for the plaintiff, it would have been the duty of the court to have set aside the verdict, and that, therefore, the court below rightly directed a verdict for the defendant, and that the judgment must be affirmed.