Argued March 18, decided March 31, 1914.

## MERRILL *v.* MISSOURI BRIDGE CO.*

(140 Pac. 439.)

**Trial—Taking Questions from Jury—Sufficiency of Evidence.**

1. Where there is no conflict in the evidence, and no dispute as to the material facts, the question is for the court, and it should direct a verdict in accordance with the undisputed evidence.

**Appeal and Error—Review—Questions of Fact—Direction of Verdict.**

2. A motion for an instructed verdict for defendant, who demands no affirmative relief, presents the same question on appeal as a motion for a judgment of nonsuit.

**Trial—Taking Questions from Jury—Nonsuit—Sufficiency of Evidence.**

3. A judgment of nonsuit is properly granted when the plaintiff fails to prove a cause of action sufficient to be submitted to the jury.

[As to when a compulsory nonsuit should be granted, see note in 24 Am. Dec. 620.]

**Appeal and Error—Review—Questions of Fact—Constitutional Provision.**

4. Within Article VII, Section 3, of the Constitution, providing that no fact tried by a jury shall be otherwise re-examined in any

*The question of the master's duty to furnish medical aid to servant is treated in notes in 28 L. R. A. 546 and 4 L. R. A. (N. S.) 49.
                                                        REPORTER.

court unless the court can affirmatively say there is no evidence to support the verdict, evidence to support the verdict must be legal evidence and must tend to prove every material fact as to which the prevailing party has the burden of proof.

### Evidence—Weight and Sufficiency—Evidence of Losing Party.

5.   In determining the sufficiency of evidence to support a verdict for plaintiff, any evidence produced by the defendant, tending to make out plaintiff's case, must be considered with that offered by plaintiff

### Master and Servant—Injuries to Servant—Actions—Sufficiency of Evidence.

6.   In an action against a lime and gypsum company and an independent contractor for death of an employee of the contractor, evidence that the employee's fingers were crushed by a steel beam, which decedent, as assistant foreman, was handling with the aid of a sufficient force of men for the purpose, is insufficient to show negligence of either defendant.

### Master and Servant—Injuries to Servant—Actions—Sufficiency of Evidence.

7.   In an action against a lime and gypsum company and an independent contractor for death of an employee of the contractor, evidence that the general foreman of the contractor took the decedent to the office of the company and directed a person, not in the employ of either defendant, to dress the crushed fingers of the decedent and put peroxide on them, while the foreman went for a team to take decedent to a doctor for treatment, and that, in the absence of the foreman, the third person, after dressing the fingers and putting on peroxide, took from the shelf in the office a bottle supposed to contain whisky, but in fact containing poison, and gave it to the decedent, causing his death, is insufficient to show negligence of either defendant causing the death.

### Death—Actions for Causing—Grounds—Negligence.

8.   Defendants, in an action for causing death, are not liable unless they were guilty of negligence in relation thereto, and such negligence was the proximate cause of death.

[As to proximate and remote causes of injury from negligence, see notes in 47 Am. Rep. 381; 50 Am. Rep. 569; 36 Am. St. Rep. 807.]

### Death—Actions for Causing—Grounds—Negligence.

9.   A lime and gypsum company, which had employed an independent contractor, was not negligent in permitting an employee of the latter, whose fingers had been crushed, to be taken for treatment to the company's office, where there was a supply of medical appliances belonging to the company and a bottle of poison belonging to the president of the company, which a third person, through mistake, administered to the injured employee, causing his death.

### Master and Servant—Injuries to Servant—Negligence of Master.

10.   A steel construction company was not negligent, rendering it liable for death of an injured employee, in failing to have a physician at a point where it had 12 employees engaged, and where there was no town; the company having arranged for the services of a physician at a town 8 miles distant.

From Multnomah: HENRY E. McGINN, Judge.

This is an action by Elizabeth F. Merrill, as administratrix of the estate of V. E. Merrill, deceased, against the Missouri Bridge & Iron Company, a corporation, and the Pacific Lime & Gypsum Company, a corporation, to recover damages for causing the death of plaintiff's intestate. From a judgment in favor of plaintiff for $2,500, defendants appeal. The facts are set forth in the opinion of the court.

REVERSED AND REMANDED, WITH INSTRUCTIONS.

For appellant, Missouri Bridge & Iron Co., there was a brief over the names of *Messrs. Wilbur & Spencer* and *Mr. A. L. Clark,* with an oral argument by *Mr. Clark.*

For appellant, Pacific Lime & Gypsum Co., there was a brief over the name of *Messrs. Beach, Simon & Nelson,* with an oral argument by *Mr. Roscoe C. Nelson.*

For respondent there was a brief and an oral argument by *Mr. J. G. Arnold.*

Department 1.    MR. JUSTICE RAMSEY delivered the opinion of the court.

On September 23, 1912, the defendant the Pacific Lime & Gypsum Company was having constructed for itself a large steel building at a point about eight miles from Huntington, in this state. The place where the building was erected is called Gypsum, but at the time that the accident occurred, referred to *infra,* there was no town or hamlet there, nor were there any houses excepting those used in connection with the erection of the said steel building.

The Pacific Lime & Gypsum Company had let the contract for the construction of said steel building to

the defendant the Missouri Bridge & Iron Company, and the last-named company was an independent contractor for the construction of said building, and said company was on September 23, 1912, engaged as an independent contractor in the construction of said building for the Pacific Lime & Gypsum Company at said place.

The decedent, V. E. Merrill, was on said 23d day of September, 1912, in the employ of the Missouri Bridge & Iron Company at Gypsum in the construction of said building. He was not in the employ of the Pacific Lime & Gypsum Company, and he was assistant to the foreman on said work: Ev., p. 42. At the time he was injured, he, with five or six other men, was engaged in rolling over a beam of steel. This beam was about 12 inches in diameter and about 14 feet long, and it weighed about 400 pounds. A number of these beams had been unloaded by the railroad and lay in a pile on the ground, and Merrill and his assistants were endeavoring to get one of these beams from said pile, and it became necessary to roll one of them over, and, in doing so, it caught Merrill's fingers between said beam that they were rolling over and another beam, and the backs of his fingers on one hand were mashed or bruised and the insides of them were cut. The injury was painful, and the wounds bled. At the time of this accident, the men, with Merrill, were working under him as assistant foreman.

A. P. Schloat was the foreman for the construction of said building, and, at the time of said accident, he was near where it occurred, and he decided to take Merrill to Huntington to have his hand dressed and treated by the company's physician, residing there; there being no physician nearer than Huntington. He took Merrill to a small office about 150 yards distant, and left him there, until he could obtain a conveyance

to take him to the physician at Huntington. This office belonged to the Pacific Lime & Gypsum Company, and it was used by that company as an office for its bookkeeper and other officers. The Missouri Bridge & Iron Company had no right in or to said office.

The Pacific Lime & Gypsum Company kept in said office, in a small box, nailed to the wall, what is called the "first aid to the injured kit," consisting of antiseptics, bandages, adhesive plasters, absorbent cotton, peroxide of hydrogen, and other antiseptics, including an antiseptic solution contained in a bottle. All of these articles, excepting said antiseptic solution belonged to the Pacific Lime & Gypsum Company. This bottle of solution was the individual property of William A. Baker, the president of said company, and it was left there by him. These articles were kept there by said last-named company for use when any of its employees should be hurt. The Missouri Bridge & Iron Company had no interest in any of said articles, and had no right to use them. However, that company's men, when hurt, had, in a few instances, been permitted to use said appliances.

Mr. Schloat obtained permission for doing so, and took Merrill to said office. Mr. T. H. Cosford was in the office, sitting at a table, and Mr. Schloat asked him if he would dress Merrill's fingers while Schloat got a team to take Merrill to Huntington to a physician. Mr. Schloat then left the office to get a team. Mr. Cosford told Mr. Schloat that he would dress Merrill's fingers and put peroxide on them, and he did so. He obtained warm water and washed the wounds, and, while he was doing so, Merrill complained of pain, and seemed faint, and Cosford suggested to him that a drink of whisky or brandy would strengthen him. Mrs. Stella Rizor, who was at that time in the office, seconded that suggestion, and Merrill himself said

that it would probably do him good. Cosford then looked up at the shelf or box from which he had obtained bandages, and seeing a plain bottle, containing a liquid of the color of whisky, took it and removed the cork, and handed it to Merrill. Merrill took several swallows, handed the bottle back to Cosford, and the latter recorked it, and placed it back on the shelf, or in the box from which he had obtained it. In a few minutes Merrill said that the stuff that he had drunk was very peculiar tasting whisky. Cosford then obtained the bottle, uncorked it, and tasted of its contents, and immediately realized that what Merrill had drunk was not whisky. Mrs. Rizor also tasted of the stuff, and decided that it was not whisky. Mrs. Rizor procured some mustard and warm water, and also some olive oil. They gave Merrill a glass of the mustard and warm water, but he drank only a part of it. They then tried to get him to drink some olive oil as an emetic, but he refused to drink it, saying that he was all right, and that he felt no ill effect from what he had drunk. There was no one in the office when Merrill's fingers were dressed, or when said liquid was given him, or when he drank the warm water with the mustard, and refused to drink the olive oil, but Merrill, Cosford and Mrs. Rizor.

Mr. Schloat obtained a team and vehicle, and Merrill got into it, and was taken to Dr. G. S. Standard, at Huntington, for treatment, and he died in a few minutes after reaching the doctor. The evidence of the doctor introduced by the plaintiff is to the following effect: That he saw Merrill a few minutes before his death, and was present with him until his death; that after examining the dead body, and ascertaining all possible facts relating to his death, the doctor gave it as his opinion that his death was caused by his drinking part of the contents of a bottle of unknown anti-

septic of a' poisonous nature; that the symptoms preceding his death were those of poisoning; and that death occurred by paralysis of the nerves of respiration, and that he did not believe that the injured hand was any part of the factor of death.

The complaint alleges that the defendants carelessly and negligently failed to furnish a sufficient number of competent servants or proper appliances for the erection and removal of said steel beams, and as a result of the carelessness and negligence of said defendants, in their failure to furnish a sufficient number of competent servants or proper appliances, a large steel beam was dropped on the hand of V. E. Merrill, thereby badly bruising and cutting said hand and fingers. The complaint alleges also that A. P. Schloat, foreman of said Missouri Bridge & Iron Company, immediately after said injury, and at the request of the defendant the Missouri Bridge & Iron Company, by and through R. P. Garrett, its vice-president, and in conformity with the express direction of the Pacific Lime & Gypsum Company, took V. E. Merrill to the office of said Pacific Lime & Gypsum Company, an office in which is kept certain salves and antiseptics for the purpose of giving immediate attention to accidents, and then turned over the said V. E. Merrill to one T. H. Cosford, agent of the defendants, and expressly requested the said T. H. Cosford to dress the injured hand aforesaid of said Merrill, and to attend to and care for him. That, while the said T. H. Cosford was treating and dressing the injured hand as requested by said defendants, the said T. H. Cosford, seeing that the said Merrill was becoming weak and faint, carelessly and negligently gave to the said Merrill a poisonous solution of antiseptic liquid, used as a disinfectant, and represented and stated to the said V. E. Merrill that it was whisky,

the bottle in which the solution was contained having no label indicating that it contained poison, and thereby carelessly and negligently caused the said Merrill to drink a quantity of the same. The said liquid was of a very poisonous nature, and thereby the defendants carelessly and negligently caused the death of said Merrill within about an hour after he drank the same, as aforesaid. The complaint alleges also that said T. H. Cosford was a careless and incompetent person to care for and attend to said Merrill, and that the defendants were guilty of negligence and carelessness in placing said Merrill in his care. The complaint alleges also that the defendants were guilty of negligence in not keeping a physician on or near the premises where the said Merrill was hurt, etc.

The answers of the defendants denied most of the material allegations of the complaint, and they allege, *inter alia,* assumption by Merrill of the risk of being hurt in handling said beams, and that said injury to his hand was the result of the negligence of Merrill and his fellow-servants, etc.

The affirmative matter of the answers was denied by the replies. After all of the evidence was in, each of the defendants moved the court to instruct the jury to find a verdict for the defendants. These motions were denied, and the defendants ask that the judgment of the court below be reversed, and they assign the denial of said motions for an instructed verdict as error.

1. When there is no conflict in the evidence, and no dispute as to the material facts of the case, the question for decision is for the court, and under such a state of facts, the court should direct the jury as to the particular verdict that they should find in accordance with the undisputed evidence: *Coffin* v. *Hutchinson,* 22 Or. 554 (30 Pac. 424); *Owens* v. *Snell,*

29 Or. 483 (44 Pac. 827); *Wolf* v. *City Ry. Co.*, 45 Or. 446 (72 Pac. 329, 78 Pac. 668); and *Patty* v. *Salem Flouring Mills Co.*, 53 Or. 350 (96 Pac. 1106, 98 Pac. 521, 100 Pac. 298).

In *Coffin* v. *Hutchinson*, 22 Or. 554 (30 Pac. 424), the court says:

"The general rule of practice undoubtedly is that it is the province of the jury to weigh the effect of oral evidence, and to determine the credibility of the witnesses, and that the court cannot ordinarily interfere with that right. But this rule of practice cannot be permitted to interfere with another one equally as well settled, and that is, when there is no conflict in the evidence, no dispute as to the facts, there is nothing to submit to the jury, and the question is one of law to be decided by the court. In such cases, it is proper for the court to direct the verdict; and a verdict thus ordered will be sustained, if the law and facts disclosed by the evidence warrant it."

2. A motion for an instructed verdict for the defendant, where no affirmative relief is demanded by the defendant, presents the same question, upon appeal, as is presented by a motion for a judgment of nonsuit: *Huber* v. *Miller,* 41 Or. 103, 111 (68 Pac. 400).

3. A judgment of nonsuit is properly granted when the plaintiff fails to prove a cause sufficient to be submitted to a jury: See Section 182, L. O. L.

4. Section 3 of Article VII of the Constitution of this state provides that no fact that has been tried by a jury "shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict." Evidence to support a verdict must be legal evidence, and must tend to prove every material fact in issue, as to which the person in whose favor the verdict was rendered had the burden of proof. If there was no evidence tending to prove any one material fact, then

there was no evidence to support the verdict. If, in any case, it was necessary for the plaintiff to prove several material facts in issue, and he proved all of them but one, and there was no evidence tending to prove that material fact, and a verdict and judgment were rendered in his favor, such verdict and judgment could be properly set aside, because, under such circumstances, the court can say affirmatively that there was no evidence to support them.

5. The question for decision in this case is whether there was evidence produced at the trial, tending to prove every material fact at issue, as to which the plaintiff had the burden of proof. Evidence produced by the defendant, if any, tending to make out the plaintiff's case, must be considered with the testimony offered by the plaintiff.

6. The evidence as to the injury to the decedent's hand shows that there was a pile of steel beams lying on the ground where the railroad had unloaded them. The Missouri Bridge & Iron Company wanted one of these beams. They were about 14 feet long and 12 inches in diameter, and weighed about 400 pounds. Merrill, who was acting as assistant foreman in handling the beams, had five or six men to assist him in rolling over one of these beams. In rolling it over, the fingers of one of his hands were caught between the beams, and bruised or mashed on the back, and cut on the inside. The other men were working under his directions, and they were his fellow-servants in said work. There were six or seven men rolling over this beam, and all that they did, up to the time that he was hurt, was to roll the beam over. Three of the men were skilled in such work. Mr. A. P. Schloat was a witness for the plaintiff. He was general foreman on the work, and he testified that the three skilled men and the others that Mr. Merrill had, assist-

ing him in rolling this beam over, were enough men to handle the beam.

It must be borne in mind that all that they did was to turn it over. The evidence fails to show who was at fault, if anyone, for the injury to Merrill's fingers. As Merrill was in charge of the men who assisted him to roll the beam over, and they had a sufficient force to handle the beam, it is evident that, if anyone was guilty of negligence, it was some of his fellow-servants or himself. The plaintiff could not recover for negligence of his fellow-servants. We find that there was no evidence tending to show negligence on the part of the Missouri Bridge & Iron Company, or the other defendant, causing the injury to Merrill's fingers.

The Pacific Lime & Gypsum Company had nothing to do with handling said beams. The other company was an independent contractor for the construction of the steel building. Merrill and the other men were working for the Missouri Bridge & Iron Company, and not for the Pacific Lime & Gypsum Company.

7. Mr. Schloat, foreman of the Missouri Bridge & Iron Company, immediately took Mr. Merrill to the office of the other company for the purpose of having his fingers bandaged: Ev., p. 30. Mr. Schloat, as a witness for the plaintiff, says that he took Mr. Merrill inside the office, and that Cosford was there, and he asked Cosford if he would dress Merrill's fingers while he got a team to take Merrill to the doctor at Huntington, and that Cosford answered that he would. Schloat then left the office and did not return until after Merrill had drunk the poison, as stated, *supra.* When he returned, he had a team and conveyance to take Merrill to the doctor at Huntington, eight miles distant. He was taken to the doctor and died, as stated, *supra.* Schloat was the only person that asked Cosford to do anything for Merrill, and all that he

asked him to do was to dress his fingers and put some peroxide on them. He did not ask him to "treat" or care for him. He intended to take Merrill to the company's physician at Huntington for treatment, and all that he asked Cosford to do was to apply those simple external remedies so as to relieve Merrill of pain temporarily, until he should reach the doctor. Cosford had no authority from him to do anything excepting to dress Merrill's fingers and put peroxide on them, and, when he did that, he had done all that Schloat authorized him to do. He had no authority from Schloat to give him whisky or anything internally.

Cosford, as a witness for the plaintiff, testified that he went and got warm water and washed Merrill's fingers and dressed his wounds with bandages that were there. He says that Merrill complained of distress, and became faint when he washed and dressed his fingers, and that the witness suggested that a drink of whisky or brandy would strengthen him, and that Mrs. Rizor, who had come into the office, seconded his suggestion, and that Merrill himself said that he thought it would probably do him good. Cosford then looked up and saw a plain bottle containing a liquid of the color of whisky, took it down, removed the cork, and handed the bottle to Merrill, and the latter took several swallows of it. Neither Cosford nor Merrill smelt of the fluid, or did anything to determine what it was, until after the latter had drunk of it. When Merrill said that it was a peculiar tasting whisky, Cosford examined it and realized at once that it was not whisky or brandy. It neither smelt nor tasted like whisky.

Mrs. Stella Rizor, who was present when Cosford gave the liquid to Merrill, was produced as a witness for the defendants. She kept a boarding-house and

boarded the men for a certain sum per week; but she
was not in the employ of either of the defendants.   She
went to the office at that time to telephone someone
at Huntington.   The only phone at Gypsum was in
that office.   This witness was near the door of the office
when Mr. Schloat took Mr. Merrill there.   She says
she suggested that Merrill's hand be tied up, and
that Cosford obtained warm water and washed the in-
jured hand.   She says that Merrill got "kind of sick,"
and Cosford suggested that, if he had a good drink of
whisky, it would be good for him, and that she said,
"Yes."   Cosford reached up to the shelf and got the
bottle and handed it to Merrill, and the latter drank
of it, as stated, *supra,* supposing it to be whisky.   She
says that she supposed that it was whisky.   Merrill
said, as she relates it, that what he drank did not taste
like "booze."   She says that Cosford then took the
bottle down and tasted it, and handed it to her, and
she tasted it, and Cosford then inquired of her whether
she had any mustard, and that she went and got some
mustard and warm water.   Mustard and warm water
were given him, but he did not vomit.   Afterward she
got olive oil to give him, but he refused to drink it.
She says that she looked down his throat to see
whether it was inflamed, but it was not red.   She says
that, in a short time, he talked with Mr. Schloat and
got into the "rig" and went to Huntington.   She says
that she had been in that office many times to tele-
phone, but never saw any whisky there.   She says that
said bottle looked like whisky or brandy.   She says
that Mr. Cosford did not smell or taste of the contents
of the bottle before he gave it to Merrill, and that
Merrill did not smell it before drinking it.   This wit-
ness says that she thought the bottle contained a little
carbolic acid, and that it did not taste like whisky, and .
that she smelt carbolic acid in it.   She says that,

when Cosford suggested to Merrill that whisky would be good for him, Merrill assented thereto.

It appears from the evidence of Cosford and Mrs. Rizor that from the time that Schloat took Merrill to the office until after he had drunk the poisonous liquid, supposing it to be whisky, there was no person in the office but Merrill, Cosford, and Mrs. Rizor. It appears from the evidence of Cosford and Mrs. Rizor that Cosford was the person who suggested that a drink of whisky would be good for Merrill, and that both Merrill and Mrs. Rizor assented to his suggestion, and that Cosford then reached up to the shelf or box and obtained said bottle, uncorked it, and gave it to Merrill, and he drank it, and that all this was done without any examination of the bottle by anyone to ascertain whether it was whisky or not. Other evidence shows that there was no whisky or brandy kept there.

William A. Baker, president of the Pacific Lime & Gypsum Company, was a witness for the defendants, and testified that the said office was used for the bookkeeper, superintendent, the architect, and himself, but that the Missouri Bridge & Iron Company and its men had no right to use said office for any purpose. As to the bottle of fluid from which Merrill drank, he said that that belonged to him individually, and not to his company. He testified that this bottle contained an antiseptic solution, and that he had found it very effective, when applied locally on cuts, bruises, etc.

The evidence shows, without any conflict, that T. H. Cosford was not an employee of, or connected with, either of the defendants, and that he was an employee of the Bates Valve Bag Company, and had a contract with the Pacific Lime & Gypsum Company for installing some machinery in the steel building of that company, then in process of construction, and that on the

day that Merrill drank said fluid at the office of the Pacific Lime & Gypsum Company, as stated, *supra,* he was in said office, examining, for his company, some papers belonging to that company, and not in the employ of either of the defendants. He arrived there in a buggy from Huntington only a short time before Merrill was hurt.

Neither of the defendants had anything to do with giving said solution to Merrill, and none of the officers or employees knew anything about it until after it had been done. It was not done as a result of any instructions or authority given by any officer or employee of either company.

A. P. Schloat, who took Merrill to said office, was an employee of the Missouri Bridge & Iron Company; but he neither did nor said anything that can reasonably be claimed to have had a tendency to cause Cosford to give said solution to Merrill. All he did was to ask Cosford to put peroxide on his fingers and to dress them while he went and obtained a team to take Merrill to the doctor. What he said did not imply that Cosford was to treat him or give him internal remedies. Cosford alone is responsible for giving Merrill the poisonous solution. He was a stranger in that office, and no one had informed him that there was any whisky there; but he reached up and took the bottle containing the solution, uncorked it, and gave it to Merrill without having examined it or taking any precautions to ascertain what it was.

8. The defendants are not liable for damages for the death of Mr. Merrill, unless they were guilty of negligence in relation thereto, and such negligence was the proximate cause of his death.

In Volume 1, Section 3, of Shearman & Redfield, Negligence (6 ed.), actionable negligence is defined thus:

"Negligence, constituting a cause of civil action, is such an omission, by a responsible person, to use that degree of care, diligence, and skill which it was his legal duty to use for the protection of another person from injury as, in a natural and continuous sequence, causes unintended damage to the latter."

The same authors, in Section 25a of the same volume, say:

"One is liable for all the injurious consequences naturally and approximately caused by his negligence."

The same authors, in Section 29 of the same volume, state the rule thus:

"The practical solution of this question appears to us to be that a person guilty of negligence should be held responsible for all the consequences which a prudent and experienced man, fully acquainted with all the circumstances which in fact existed (whether they could have been ascertained by reasonable diligence or not), would, at the time of the negligent act, have been thought reasonably possible to follow, if they had occurred to his mind."

The same authors, in Section 32 of the same volume, say:

"The connection between the defendant's negligence and the plaintiff's injury may be broken by an intervening cause. In order to excuse the defendant, however, this intervening cause must be either a superseding or a responsible cause. It is a superseding cause, whether intelligent or not, if it so entirely supersedes the operation of the defendant's negligence that it alone, without his negligence, contributing thereto, in the slightest degree, produces the injury."

In *Bowers* v. *East Tennessee & W. N. C. R. Co.,* 144 N. C. 684 (57 S. E. 454, 12 L. R. A. (N. S.) 446), the Supreme Court of North Carolina says:

"It seems from the authorities that there are two very essential elements in the doctrine of proximate

cause: (1) It must appear that the injury was the natural or probable consequence of the negligent or wrongful act; (2) that it ought to have been foreseen in the light of attending circumstances.''

In *Milwaukee etc. R. Co. v. Kellogg,* 94 U. S. 475 (24 L. Ed. 256), the court says:

''But it is generally held that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances.''

In *Cleghorn v. Thompson,* 62 Kan. 727 (64 Pac. 605, 54 L. R. A. 404), the Supreme Court of Kansas says:

''We may say, then, that negligence, to be actionable, must result in damage to someone, which result, under all the circumstances might have been reasonably foreseen by a man of ordinary intelligence and prudence, and be the probable result of the initial act.''

In *Missouri Pac. Ry. Co. v. Columbia,* 65 Kan. 390 (69 Pac. 338, 58 L. R. A. 399), the court says:

''In cases of this character, where two distinct, successive causes, unrelated in operations, to some extent contribute to an injury, it is settled, when there is an intervening and direct cause, a prior and remote cause cannot be made the basis for recovery of damages, if such prior cause did no more than furnish the condition or give rise to the occasion by which the injury was made possible.''

In *Reddick v. General Chemical Co.,* 124 Ill. App. 35, the court says:

''The nearest efficient cause which is adequate to produce and does bring about an accident is the proximate cause of that accident. Such new and independent cause supersedes prior causes and negligences, if they exist.''

In *Goodlander Mill Co.* v. *Standard Oil Co.*, 63 Fed. 400 (11 C. C. A. 253, 27 L. R. A. 583), the facts were that the defendant shipped to a consignee a carload of crude petroleum in a car which had no valve, regulating the outflow of the oil. The consignee had the car removed to a sidetrack, and then, with knowledge that the car was leaking, attempted to draw off the oil near the plaintiff's mill, the engine-room of which was lower than the track. Owing to the absence of the valve, the oil ran out so rapidly that it flowed into plaintiff's engine-room, exploded and destroyed the mill. The United States Circuit Court of Appeals held that the defendant was not liable therefor, since its negligence was not the proximate cause of the injury.

4 Thompson, Negligence, Section 3774, says:

"In applying this doctrine of reasonable care, it is well held that a master is not liable for injuries to his servant, resulting from an accident of such a character that reasonable men, proceeding with reasonable caution, would not ordinarily have foreseen and anticipated it; such an injury happening under very exceptional circumstances, although the precautionary measures, if taken, would have prevented it."

In *Ford* v. *Tremont Lumber Co.*, 123 La. 742 (49 South. 492, 131 Am. St. Rep. 370, 22 L. R. A. (N. S.) 917), the syllabus is as follows:

"The master is not liable for injuries to his servant, resulting from an accident of such a character that * * reasonable caution would not ordinarily have foreseen and anticipated it. A person is negligent for failing to anticipate that other persons will be negligent."

The defendants can be held in this case only for negligence that is the proximate cause of the injury to the plaintiff's intestate, Merrill, and, if they were not

guilty of negligence of that character, the plaintiff has no cause of action against them.

We have stated, *supra,* the substance of the material evidence. There is no conflict in the evidence as to the material facts, and the questions for decision are matters of law.

The injury to Merrill's fingers was to no extent the cause of his death. His death was caused by the fluid that T. H. Cosford gave him to drink, thinking that it was whisky, and the material question for decision is whether the defendants were guilty of negligence that was the proximate cause of the giving of said solution to Merrill. J. C. Schloat was the foreman of the Missouri Bridge & Iron Company, and he took Merrill to the office of the other company, and asked Cosford, as stated *supra,* to dress his fingers and put peroxide on them. That is all that Schloat asked Cosford to do. Schloat did not go into the office, but, when Cosford signified that he would dress Merrill's fingers and put peroxide on them, Schloat went immediately to get a conveyance to take Merrill to the doctor. In a few minutes he returned with the conveyance. While he was gone, Cosford dressed Merrill's fingers and put peroxide on them, as Schloat had requested. That far he had followed Schloat's instructions; but, in addition to that, he had given him the poisonous solution that caused Merrill's death. We hold that neither of the defendants is responsible for this unfortunate act of Cosford's. No man, under the circumstances, however wise or prudent, could or would have foreseen that Cosford would take a bottle of medicine, uncork it, and give it to Merrill to drink, without smelling or tasting it, or taking any precautions to determine whether it was whisky or something else. There was nothing on the bottle to indicate that it was whisky. No person represented to him that it was whisky, or

that there was any whisky kept there.   It would have been an easy matter to determine that it was not whisky, as was shown after Merrill drank it and expressed the opinion that it was not whisky.   As soon as Cosford tasted the solution, he realized his mistake. He was a stranger there, and had no reason to believe that there was any whisky in the office.

9. The Pacific Lime & Gypsum Company owned and controlled the office, and owned the medical appliances that were there, excepting said solution contained in said bottle.   That bottle and its contents belonged to the president of the company, but that company was not guilty of negligence in permitting Merrill to be taken to said office to have his fingers dressed with the company's appliances.   As stated *supra,* Cosford was not an employee of either of the defendants, and had no connection with them.   He was an employee of another company, and was there in the interest of his company, when Merrill was taken to said office.   His giving said medicine to Merrill to drink was his own act, and he alone is responsible for what he did.   He evidently intended well.

10. The Missouri Bridge & Iron Company was not guilty of negligence in not having a physician resident at or near Gypsum.   It had made arrangements with a physician at Huntington to treat any of its employees that should need medical treatment.   That company had less than 12 employees there.   We find that the motions for an instructed verdict should have been sustained, and that the trial court erred in not instructing the jury to return a verdict for the defendants.

The accident was a very sad one, but under the facts, as shown by the bill of exceptions, it is clear that the defendants were not at fault therefor.   No degree of prudence, on the part of the defendants, would have foreseen that Cosford would give the poisonous solu-

tion to Merrill to drink, without exercising the slightest precaution to ascertain whether it was whisky. The defendants being without negligence in the matter it is our bounden duty to hold that they were not liable for damages for the death of Mr. Merrill.

The evidence is all before us, and, from the evidence, we find that there should have been a judgment in the Circuit Court for the defendants. We find that the court below erred in not instructing the jury to find a verdict for the defendants.

The judgment of the court below is reversed, and this cause is remanded to the court below, with instructions to enter a final judgment for the defendants for costs and disbursements.

REVERSED AND REMANDED, WITH INSTRUCTIONS.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE MOORE and MR. JUSTICE BURNETT concur.